# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| CLARA FRAZIER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 17 C 8484 |
| v. ) | |
| ) | Magistrate Judge Michael T. Mason |
| NANCY A. BERRYHILL, Acting ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Clara Frazier ("Frazier" or "claimant"), has brought a motion for summary judgment [12] seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for disability insurance benefits and supplemental security income under the Social Security Act ("Act"), 42 U.S.C. §§ 416(i) and 423(d). The Commissioner filed a cross-motion for summary judgment asking that we uphold the decision. [19]. We have jurisdiction to hear this matter pursuant to 42 U.S.C. § 405(g). For the reasons set forth below, claimant's motion is granted, and the Commissioner's motion is denied. This case is remanded to the Social Security Administration for further proceedings consistent with this Opinion.

## I. BACKGROUND

### A. Procedural History

Frazier filed her application for disability benefits on February 13, 2014, alleging that her disability began on August 15, 2013. (R. 199-205.) She later amended the onset date to October 10, 2015. (R. 103.) Frazier's application was denied initially on May 20, 2014, and again on reconsideration on March 9, 2015. (R. 121-25, 131-38.) Frazier then requested a hearing before an Administrative Law Judge ("ALJ"), which was held on August 9, 2016. (R. 18-55.) At the

hearing, both Frazier and Vocational Expert ("VE") Gary Wilhelm testified. No medical expert appeared. The ALJ issued a decision denying benefits on November 8, 2016. (R. 101-14.) The Appeals Council ("AC") granted review and issued a September 19, 2017 decision that was unfavorable to Frazier, making it the Commissioner's final decision. (R. 408.) 20 C.F.R. § 404.981. Claimant subsequently filed this action in the district court on November 22, 2017.

**B.   The Relevant Medical Evidence**

Frazier was involved in an accident while driving a school bus on August 15, 2013 that she claims required her to stop working due to pain in her back and lower extremities. A cervical x-ray dated August 15, 2013 showed mild degenerative changes throughout her neck without any acute abnormalities. (R. 309-10.) Frazier was diagnosed with neck and back strain and was referred to physical therapy. (R. 312.) On October 11, 2013, she consulted Dr. Anil Kesani, claiming that her lower back pain had become much worse since the accident despite undergoing four weeks of therapy. (R. 322.) The pain radiated from the lower back into her legs and was increased by sitting, bending, lifting, or twisting. (*Id.*) Frazier had already undergone an MRI of her lumbar spine that showed multilevel degenerative disc disease, degenerative facet arthrosis with hypertrophy at L4-L5 and L5-S1, disc bulging at L3-L4 and L4-L5, and foraminal narrowing at L5-S1. (R. 554.) Dr. Kesani assessed sciatica, degeneration and displacement of the lumbosacral disc, and lumbosacral spondylosis. (*Id.*) The doctor started Frazier on gabapentin and naproxen and prescribed physical therapy. (R. 323.)

Frazier reported little improvement in her symptoms when she next saw Dr. Kesani on November 8, 2013. (R. 324-25.) As a result, the doctor added Tylenol #3 to her pain medication, and on December 6 also prescribed Prednisone and Flexeril. (R. 325, 327.) By March 17, 2014, Frazier reported that her back pain had not improved, and her leg pain was worse. (R. 332.) Dr.

Kesani had referred Frazier to a pain specialist in 2013, but she reported in March 2014 that her insurance company had not approved the consultation. (*Id.*) That remained the case throughout 2014 and up to Dr. Kesani's last treatment note dated February 11, 2015. (R. 552.)

After multiple trips to the emergency room in 2014 and 2015 for back pain, Frazier began treatment on November 4, 2015 with orthopedist Dr. Cara Thomas. Dr. Thomas noted decreased sensation in Frazier's lumbar spine, 4/5 strength in her right hip flexion, and a positive straight leg raise of the right leg. (R. 643.) Dr. Thomas noted the same symptoms on November 15 and recommended an EMG/nerve conduction study. (R. 639.) The results of the EMG study were abnormal. Dr. Amir El Shami noted that the EMG showed symmetric axonal peripheral polyneuropathy (an injury to multiple peripheral nerves) and suggested chronic L5-S1 radiculopathy (a compression of the spinal nerve). (R. 655.) Orthopedist Dr. James Haeberlin confirmed those findings when he saw Frazier on January 14, 2016. (R. 636-37.) Dr. Haeberlin noted that Frazier had numbness, tingling, and weakness in her right leg. Like Dr. Thomas, Dr. Haeberlin assessed 4/5 strength in Frazier's right leg and assessed decreased sensation in the lumbar spine. (R. 637.)

On January 12, February 9, February 23, and March 7, 2016, Frazier sought emergency treatment for back pain at the Metro South Emergency Room. She stated during her March 7 visit that she had been experiencing pain radiating into her leg. (R. 761.) Doctors prescribed Flexeril, Norco, and Prednisone for Frazier's pain and released her from the hospital. (R. 762.) She then treated with Dr. Alex Behar on March 11, 2016. Dr. Behar noted that she complained of constant pain at a level of 10 out of 10, "with needles going down all the way to her toes." (R. 645.) A physical examination showed that Frazier had positive slump tests that caused pain to extend through her toes bilaterally. (*Id*.) Frazier was referred to a pain clinic for an epidural injection,

and her gabapentin dose was increased from 300 mg. up to 1,200 mg. a day for a period of time. (R. 645-46.) Frazier told another treater on April 6 that the increase in gabapentin had not helped her pain and that it made her "high and sleepy." (R. 648.). Following several trips to the emergency room for back pain in April and May, Frazier underwent an MRI for her lumbar spine on August 22, 2016. It revealed an extensive spinal lipomatosis (a fat accumulation that compresses the epidural space) that, in combination with other degenerative changes, caused spinal canal and neural foraminal stenosis at L4-L5 and L5-S1. (R. 670.)

### C. The State Agency Experts

Two non-examining experts provided assessments of the effects that Frazier's impairments had on her ability to work. On May 19, 2014, Dr. Towfig Armand concluded that Frazier had the residual functional capacity ("RFC") to carry out light work as that term is defined in 20 C.F.R. § 404.1567(b) as long as various exertional and environmental restrictions were applied. Dr. Armand stated that Frazier would be limited to occasional stooping, crawling, and climbing of ladders, ropes and scaffolds,. She would also need to avoid concentrated exposure to fumes, odors, dusts, and gases. (R. 59-61.) Dr. Michael Nenaber agreed with those conclusions on March 4, 2015, except that he found that Frazier had an unlimited ability to climb ramps and stairs. (R. 74-84.)

### D. Claimant's Testimony

At the August 9, 2016 administrative hearing, Frazier testified that she was injured in August 2013 when a car struck the school bus that she was driving. (R. 24.) Although she also suffered from hypertension and asthma, Frazier told the ALJ that her back pain related to the vehicle accident was the primary reason why she could not work. (R. 28.) She underwent several weeks of physical therapy after the accident, though it had little effect on her back pain. (R. 32.)

Frazier explained that her early treatment options were limited; she had been referred to an orthopedist by a "company doctor," but she was unable to continue with therapy or other treatment options because she lacked medical insurance. Workers compensation, which was her primary source of treatment, would not approve more aggressive treatment. (R. 32-33.) When her back pain worsened in 2015, however, Frazier was able to seek out other medical care because she was covered by Medicaid at that point. (R. 32.)

Frazier testified that she experiences pain every day that radiates from her lower back to the soles of her feet. (R. 33.) Gabapentin helped to control her pain at first, but it is no longer effective. (*Id*.) Frazier described her leg pain as a burning sensation that requires her to use a cane just to stand. (R. 36.) She can stand for 10 minutes with the cane and sit comfortably for up to 25 minutes at a time. (*Id*.) Frazier told the ALJ that she can only walk for half a block, though her inability to walk further was a function of breathing problems related to asthma instead of leg pain. (R. 41.) Frazier described her activities of daily living ("ADL") as limited. She can bathe and dress herself "a little bit," but she is no longer to make her bed or do any housework. (R. 37-38.)

## II. LEGAL ANALYSIS

### A. Standard of Review

This Court will affirm the ALJ's decision if it is supported by substantial evidence and is free from legal error. 42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence is more than a scintilla of evidence; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). In our review, we must consider the entire administrative record, but will not 're-weigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner."

*Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003) (citing *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000)). This Court will "conduct a critical review of the evidence" and will not let the Commissioner's decision stand "if it lacks evidentiary support or an adequate discussion of the issues." *Lopez*, 336 F.3d at 539 (quoting *Steele*, 290 F.3d at 940).

In addition, while the ALJ "is not required to address every piece of evidence," she "must build an accurate and logical bridge from the evidence to [her] conclusion." *Clifford*, 227 F.3d at 872. The ALJ must "sufficiently articulate [her] assessment of the evidence to assure us that the ALJ considered the important evidence . . . [and to enable] us to trace the path of the ALJ's reasoning." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (per curium) (quoting *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985)).

### B. Analysis under the Social Security Act

To qualify for disability benefits, a claimant must be "disabled" under the Act. A person is disabled under the Act if "he or she has an inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which . . . lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). In determining whether a claimant is disabled, the ALJ must consider the following five-step inquiry: "(1) whether the claimant is currently employed, (2) whether the claimant has a severe impairment, (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling, (4) if the claimant does not have a conclusively disabling impairment, whether she can perform her past relevant work, and (5) whether the claimant is capable of performing any work in the national economy." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). The claimant has the burden of establishing a disability at steps one through four. *Zurawski v. Halter*, 245 F.3d 881, 885-86 (7th Cir. 2001). At step five, the burden shifts to the

Commissioner to show that the "claimant is capable of performing work in the national economy." *Id*. at 886.

The ALJ followed this five-step analysis in denying Frazier's claim for benefits.[1] At step one, she found that Frazier had not engaged in substantial gainful activity since her amended onset date of October 10, 2015. (R. 103.) Frazier's severe impairments at step two were degenerative disc disease with right lower extremity radiculopathy, axonal peripheral polyneuropathy, hypertension, and asthma. (*Id*.) The ALJ concluded at step three that none of these impairments met or medically equaled a listed impairment, either singly or in combination. (R. 105-06.) Before moving to step four, the ALJ considered Frazier's statements concerning the frequency and severity of her symptoms, finding that medical evidence did not fully support Frazier's testimony. She reasoned that the limitations that Frazier described about her ADLs could not be objectively verified, and that it was not clear that any limitations that she experienced resulted from her medical condition. (R. 111.) The ALJ also assigned substantial weight to the findings of the state-agency experts Dr. Armand and Dr. Nenaber that Frazier had the RFC to carry out light work, though with greater restrictions than either of these experts thought were necessary. These restrictions included findings that Frazier could never climb ropes and ladders; could occasionally stoop, crawl, balance, crouch, climb ramps and stairs; could frequently reach overhead; could occasionally be exposed to fumes and other environmental irritants; and required a sit/stand option that permitted Frazier to sit for five minutes after standing for one hour, or stand for five minutes after sitting for an hour. (R. 106.) Based on these findings and the testimony of a vocational

---

[1] As noted earlier, the AC's September 29, 2017 decision denying DIB and SSI to Frazier is the Commissioner's final decision. The AC granted review of the ALJ's November 8, 2016 decision because Frazier submitted 26 pages of medical records to the AC that the ALJ did not have an opportunity to review. These include medical records from the University of Illinois dated April 6, 2016 through July 15, 2016. (R. 5-6.) The Commissioner concedes that the AC's decision is "identical" to the ALJ's, (Doc. 20 at p. 4.), and both parties' motions address the ALJ's findings instead of the AC's more limited discussion of Frazier's condition. The Court therefore addresses the reasons for denying benefits set out in the ALJ's opinion instead of the AC's written decision.

7

expert, the ALJ determined at step four that Frazier could perform her past relevant work as a school bus driver. (R. 111.) Accordingly, the ALJ concluded that Frazier was not disabled through the date of the ALJ's decision without moving to step five. (R. 112-13.)

Frazier now argues that the ALJ's decision is erroneous because (1) the ALJ did not properly assess what Frazier stated about the frequency and severity of her symptoms, and (2) the substantial evidence does not support the RFC assessment.[2]

### C.  The ALJ Failed to Build an Accurate and Logical Bridge From the Evidence to Her conclusion that the Record Did Not Entirely Support Frazier's Symptom Allegations

An ALJ is always required to "build a logical bridge between the evidence and [her] conclusion" that the record does not support a claimant's testimony about her symptoms. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). A reviewing court may overturn a symptom analysis if the ALJ fails to justify her conclusions with specific reasons that are supported by the record. *Cullinan v. Berryhill*, 878 F.3d 598, 603 (7th Cir. 2017) ("We will overturn an ALJ's decision to discredit a claimant's alleged symptoms only if the decision is 'patently wrong,' meaning that it lacks explanation or support."). An ALJ's analysis should consider the claimant's daily activities; the frequency and intensity of her symptoms; the dosage and side effects of medications; non-medication treatment; factors that aggravate her condition; and functional restrictions that result from, or are used to treat, the claimant's symptoms. 20 C.F.R. § 404.1529(c); SSR 16-3p. When considering a claimant's symptoms, the ALJ must build a logical bridge between his or her statements and the record. *See Cullinan*, 878 F.3d at 603 ("A credibility determination lacks

---

[2] Frazier also claims that the Commissioner has filed an incomplete administrative record with the Court by failing to include the additional 26 pages that were submitted to the AC. It is unclear why Frazier has raised this issue, as she concedes that she is not entitled to remand on that basis. (Doc. 12 at p. 10). Moreover, Frazier fails to identify what these records contain, what relevance they have to her disability claim, or what prejudice she has experienced because of their omission. It is well established that such a skeletal argument is waived. *See Hernandez v. Cook Cty. Sheriff's Office*, 634 F.3d 906, 913 (7th Cir. 2011).

support when it relies on inferences that are not logically based on specific findings and evidence.") (citing *Murphy v. Colvin*, 759 F.3d 811, 816 (7th Cir. 2014)); *Villano*, 556 F.3d at 562-63 (requiring an analysis of the SSR 96-7p, now the SSR 16-3p, factors as part of a logical bridge for the credibility analysis).

The ALJ began her analysis of these factors by addressing two aspects of the medical record that she concluded were inconsistent with the symptoms that Frazier described. The ALJ pointed out that x-rays taken of Frazier's lumbar spine after her 2013 accident showed only mild degenerative changes. (R. 108, 309.) In addition, physical examination findings made in June 2014 were largely benign, and Frazier showed few serious deficiencies during other exams in June and August 2014. (R. 108.) The ALJ's reliance on these test results is unavailing because the ALJ failed to explain what relevance they have to Frazier's allegation that she suffers from disabling symptoms. Frazier does not claim that she was disabled during 2013 or 2014, when the x-rays and exam findings that the ALJ cited were made. Instead, she alleges that she only became disabled on October 10, 2015 after her condition had worsened following the 2013 bus accident. The fact that Frazier had been diagnosed in 2013 and 2014 with impairments that would later form the basis of her disability claim does not make the earlier medical records automatically relevant. *See Lichter v. Bowen*, 814 F.2d 430, 435 (7th Cir. 1987) (stating that "the critical date is the date of *onset* of disability, *not* the date of diagnosis") (internal quotes and citation omitted). Absent any explanation, the ALJ could not logically dispute Frazier's testimony by citing medical evidence from a period when Frazier concedes she was not disabled.

The ALJ next claimed that inconsistencies existed in findings made by different medical providers related to Frazier's strength and spinal function. She noted that Dr. El Shami stated on January 14, 2016 that Frazier had 4/5 muscle strength in her right leg and experienced some

9

decreased sensation to light touching of the L3 to S1 dermatomes (skin areas supplied with afferent nerve fibers) on the right lumbar spine. (R. 637.) The ALJ contrasted that with a December 9, 2015 finding "by another examining provider" that found 5/5 strength in Frazier's right leg with no decrease in dermatome sensation. (R. 109, 652.) Again, however, the ALJ failed to explain what relevance these observations have to Frazier's testimony. Contrary to the ALJ's claim, the December 2015 and January 2016 examinations that the ALJ relied on were not carried out by different medical examiners; Dr. El Shami examined Frazier on both occasions. (R. 652-55.) It is true that Dr. El Shami concluded that Frazier showed somewhat better strength and dermatome sensations in December than she did in January 2016. But the ALJ never discussed what dermatome sensations are, what they suggested about Frazier's condition, or why the differences the ALJ noted justified discounting Frazier's symptom testimony. No medical examiner was present at the hearing to interpret Dr. El Shami's findings for the ALJ. *See Schmidt v. Sullivan*, 914 F.2d 117, 118 (7th Cir. 1990) ("The medical expertise of the Social Security Administration is reflected in regulations; it is not the birthright of the lawyers who apply them."). Nor did the ALJ consider that the changes she noted –which appear to have been relatively minor – might have resulted from normal fluctuations in symptoms related to the medical impairments that Frazier had. *See* SSR 16-3p ("Symptoms may vary in their intensity, persistence, and functional effects, or may worsen or improve with time").

Even if these two exams involved a meaningful difference in Frazier's conditnion, the ALJ failed to explain how she could rely on it in light of other findings in the record. Multiple entries confirm Dr. El Shami's observation that Frazier had decreased right dermatome sensations. Dr. Matthew Marcus noted such decreases (as well as 4/5 strength in Frazier's right leg) on November 4, 2015. (R. 653.) Dr. El Shami found decreased sensation in L3-L4, L4-L5, and L5-S1

10

dermatomes bilaterally on March 11, 2016, suggesting that Frazier's condition might have worsened from the right-sided decrease in sensation noted in January 2016. (R. 646.) Dr. Anis Mekhail also confirmed Dr. El Shami's earlier observations by noting on July 15, 2016 that Frazier showed "decreased sensation at L3-S1 dermatomes on the right." (R. 667.) The ALJ overlooked all of these findings. An ALJ is not required to cite every item of evidence, *Getch v. Astrue*, 539 F.3d 473, 480 (7th Cir. 2008), but she cannot cherry-pick from the record by ignoring evidence that runs counter to a finding that the claimant is not disabled. *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010).

In addition, the ALJ's reliance on the differences between Frazier's December 2015 and January 2016 exams fails to account for the fact that neither Dr. El Shami nor any of the other doctors who examined Frazier during this period found those differences to be meaningful. No treater doubted Frazier's claim that she experienced significant pain because her leg was stronger, and her dermatome sensations were more intact, at one exam than they were at another. In fact, Dr. Behar, who examined Frazier on March 11, 2016, implicitly credited her pain-related claims by restarting her on gabapentin and referring her for an epidural injection. (R. 646.) That should have given the ALJ pause before finding that the record undermined Frazier's claims. *See Lambert v. Berryhill*, 896 F.3d 768, 777 (7th Cir. 2018) (faulting an ALJ for citing normal tests without noting that the claimant's physicians found no contradiction between the tests and the claimant's pain allegations).

The absence of definitive medical evidence does not end an ALJ's symptom analysis because a claimant's "testimony cannot be disregarded simply because it is not corroborated by objective medical evidence." *Hill v. Colvin*, 807 F.3d 862, 869 (7th Cir. 2015). The ALJ must also consider other factors such as the claimant's ADLs. *See Israel v. Colvin*, 840 F.3d 432, 440

(7th Cir. 2016); *Clifford*, 227 F.3d at 871. The ALJ did so here, stating that Frazier tried to live independently "as much as possible" and could do things like make her bed, prepare simple meals, manage her personal hygiene, and shop for food in stores once a month. (R. 111.) The activities that the ALJ described were taken from Frazier's written function report issued in April 2014. (R. 232-40.) The ALJ then noted additional limitations outlined in Frazier's more recent December 2014 report. (R. 253-60.) These included needing help in showering, preparing meals, shopping, and managing household tasks. Although the ALJ did not explain what these pre-onset descriptions of Frazier's functioning had to do with her condition after October 2015, she further noted some of the symptom-related testimony that Frazier gave at the hearing. Frazier told the ALJ that she prepares simple meals like sandwiches or frozen dinners two to three times a week while sitting on a stool. (R. 43.) She can shop in stores, but Frazier clarified that she only did so if she could sit in "one of [those] little carts" in the store. (*Id.*) Contrary to the ALJ's claim, Frazier stated that she could not make her bed. (*Id.*) She can only walk for half a block, stand for 10 minutes, and sit for 20-25 minutes. (R. 36, 41.)

The Court is unable to follow the basis of how the ALJ construed Frazier's testimony about her symptoms. The ALJ relied on familiar boilerplate language to claim that Frazier's descriptions of her symptoms "are not entirely consistent with the medical evidence" in the record. (R. 107.) It is unclear, however, what symptoms the ALJ questioned, or what evidence she relied on to dispute anything that Frazier stated. The Commissioner claims that the ALJ relied on her general summary of the medical record to discount Frazier's testimony. Even if true, that is insufficient to uphold the ALJ's conclusion because courts have repeatedly stated that, without further analysis that the ALJ in this case did not provide, an evidentiary summary is not adequate to support a symptom analysis. *See, e.g.*, *Larson v. Colvin*, 26 F. Supp.3d 798, 811 (N.D. Ill. 2014) ("[The

ALJ] could not simply summarize the evidence and say it didn't support Mr. Larson's allegations. Just as an expert's *ipse dixit* is not acceptable . . . neither is an ALJ's. That is the whole point of the logical bridge requirement."); *Elmalech v. Berryhill*, No. 17 C 8606, 2018 WL 4616289, at *10 (N.D. Ill. Sept. 26, 2018).

That said, the ALJ did not base the symptom evaluation solely on her evidentiary summary. The ALJ acknowledged that Frazier's ADLs were limited, but she went on to conclude (again using boilerplate language) that they did not support a finding that Frazier was disabled because they could not be "objectively verified with any reasonable degree of certainty." (R. 111.) That also fails to provide any meaningful explanation of the ALJ's reasoning. The language the ALJ cited is not necessarily an improper basis for doubting a claimant's testimony, but it cannot be a ground for discounting a claimant's statements when, as here, it is not accompanied by specific reasoning that links the record to the ALJ's decision. As the Seventh Circuit has stated, the fact that a claimant's responses to the ALJ's ADL questions are not accompanied by objective evidence is not automatically a ground for rejecting them – "otherwise, why ask in the first place?" *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014) (addressing identical language). *See also Wilson v. Colvin*, No. 14 C 447, 2015 WL 4555155, at *9 (N.D. Ill. July 28, 2015); *Trichak v. Colvin*, 2014 WL 3408687, at *7 (D. Colo. July 14, 2014); *Sadler v. Comm. of Soc. Sec.*, 2014 WL 642235, at *9 (W.D. Mich. Feb. 19, 2014).

The ALJ next stated that even if Frazier were as limited as she claimed, it was difficult to attribute those restrictions to her medical concerns instead of "other reasons." (R. 111.) Unfortunately, the ALJ never explained what the alternative reasons for Frazier's restricted activities might be. *See Zurawski*, 245 F.3d at 889 (stating that "the ALJ's analysis must provide some glimpse into the reasoning behind her decision to deny benefits"). *See also Briscoe ex rel.*

13

*Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005) ("In addition to relying on substantial evidence, the ALJ must also explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review."). A review of the "other reasons" that the ALJ addressed in her decision highlights the difficulties the ALJ would have faced had she attempted to provide such an explanation. For example, Frazier appeared with a cane at the administrative hearing and told the ALJ that a doctor had recommended it five months earlier to help her maintain her balance. (R. 35.) The ALJ objected to Frazier's claim that she needed to use a cane because the record did not show that any of her physicians prescribed it. (R. 110.) Yet the fact that a doctor may not have issued a prescription for an ambulatory device like a cane is not necessarily a ground for rejecting a claimant's statements about her mobility. *See Stahl v. Colvin*, 632 Fed.Appx. 853, 860 (7th Cir. 2015) ("Although it appears that no doctor ever prescribed crutches for [claimant], no prescription is necessary; crutches can be bought by anyone who wants them.").

The ALJ was more specific in criticizing Frazier's account of her symptoms on the ground that she received what the ALJ described as "only very conservative and routine treatment." (R. 107.) The ALJ noted that Frazier's doctors prescribed physical therapy after the August 2013 accident and recommended that she see a pain specialist. Conservative care continued in February 2015, when Dr. Saldanha suggested spinal injections and pain management that Frazier did not follow up on. In January 2016, Dr. El Shami recommended what the ALJ characterized as "rather conservative referrals" to a neurologist and physical therapist. (R. 109.) Treatment recommendations such as injections and physical therapy constitute conservative care, which combined with a claimant's failure to follow a physician's treatment recommendations, may suggest that the claimant's symptoms are not serious as she alleges. *See Olsen v. Colvin*, 551 Fed.Appx. 868, 875 (7th Cir. 2014). *See also* SSR 16-3p ("[I]f the individual fails to follow

prescribed treatment that might improve symptoms, we may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record").

Despite the conservative nature of her care, the ALJ's discussion of Frazier's treatment raises serious concerns about how she construed the record to assess Frazier's testimony. Much of the ALJ's discussion of Frazier's care involves the period between her August 2013 accident and early 2015. The ALJ noted, for example, that Frazier had failed to follow up with a referral to a pain specialist by June 2014. (R. 108.) She also cited a February 11, 2015 treatment note stating that Frazier had "elected for conservative treatment" such as injections and a referral to a pain specialist, but had not yet seen one. (R. 108, 552.) The ALJ never explained why these entries were relevant to Frazier's symptom allegations after the amended onset date of October 10, 2015. Indeed, the ALJ herself stated in other parts of her decision that the pre-onset period was not relevant to Frazier's symptoms after October 2015: the ALJ rejected an assessment of Frazier's exertional limitations given by a treater in 2013 and 2014 because those findings "were authored well before the amended alleged onset date." (R. 108.) The ALJ did not explain why Frazier's conservative treatment choices before October 10, 2015 were relevant to the symptom analysis if an examining doctor's findings could be dismissed because they were made before the onset date.

Even if the pre-onset period were relevant to Frazier's post-October 2015 disability claim, Frazier told the ALJ that she did not see a pain management specialist or seek out more aggressive treatment immediately after the accident because she was only covered by worker's compensation at that point, and "the accident had . . . just occurred and it wasn't, I wasn't as bad as I am now." (R. 31, 39.) The record confirms those claims. Frazier's applications for physical therapy were denied at least from December 2013 through March 2014. (R. 326, 328, 330, 332.) Insurance problems also prevented Frazier from seeing a pain specialist in June 2014 (which the ALJ noted),

15

and again by February 15, 2015 (which the ALJ overlooked). (R. 552.) The ALJ cited some of what Frazier told her about insurance problems following the 2013 vehicular accident, but she did not explain why Frazier's limited access to specialist care did not mitigate the ALJ's concerns about Frazier's conservative treatment. *See Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012) (stating that an inability to afford treatment may explain a claimant's treatment choices).

As for Frazier's treatment after her alleged onset date, the ALJ cited only one entry to claim that her care was unduly conservative. On January 14, 2016, Dr. El Shami reviewed an abnormal EMG study of Frazier's lumbar spine that showed axonal peripheral polyneuropathy. Dr. El Shami referred Frazier to a neurologist for further review of the EMG results, prescribed gabapentin for her pain, and suggested that she enter physical therapy. (R. 637.) The ALJ characterized these recommendations as conservative in nature and noted that Frazier did not follow up with the neurologist or pursue therapy. (R. 109.) Before an ALJ can criticize a claimant for not following a doctor's recommendations, however, she must first determine "if there are good reasons for the failure to complete the [prescribed] plan" by asking the claimant why she did not do so. *Murphy*, 759 F.3d at 816. *See also Shauger*, 675 F.3d at 696 ("Although a history of sporadic treatment or the failure to follow a treatment plan can undermine a claimant's credibility, an ALJ must first explore the claimant's reasons for the lack of medical care before drawing a negative inference."). The ALJ never asked Frazier to explain why she did not see the neurologist that Dr. El Shami recommended.[3] Nor did the ALJ address Frazier's testimony that the physical therapy she took

---

[3] Frazier testified that she was only covered by worker's compensation until she became eligible for Medicaid at some point in 2014. (R. 32.) The ALJ asked Frazier why she did not "see somebody a year ago," which presumably referred to the alleged onset date of October 10, 2015. (R. 32.) Frazier stated, somewhat unclearly, that she had been referred by "the company doctor" to Dr. Anil Kesani until he "left town" at an unspecified time in 2015. (*Id.*) The ALJ did not try to clarify what this meant or what it had to do with the October 2015 period, but her suggestion that Frazier did not "see somebody" around the time she claimed that her back pain worsened misreads the record. Frazier went to the ER on October 5, 2015 for back pain. (R. 1022-44.) She then consulted Dr. Cara Thomas on November 4 and November 13. (R. 651, 639-41.) The EMG study was carried out on December 9, 2015. (R. 655.) The ALJ herself cited numerous treatment notes for early 2016.

16

after her vehicular accident did not provide any lasting relief from pain. (R. 32-33). That precluded the ALJ from considering whether Frazier declined further therapy based on the lack of results she claimed she had received from it.

The fact that treatment is conservative, moreover, does not always mean that a claimant has exaggerated her symptoms. An ALJ must always consider the degree to which the claimant's treatment alleviated her symptoms, even if it was conservative. *Dyer v. Berryhill*, 237 F. Supp.3d 772, 776 (N.D. Ill. 2017). The ALJ did not address that issue in this case, concluding instead that Frazier's "neuropathy is manageable with [the conservative] measures" that Dr. El Shami recommended. (R. 109.) Yet Frazier consistently told both the ALJ and her medical treaters that was not the case. She testified that, in addition to ineffective physical therapy, the gabapentin that she took for pain had stopped working. (R. 32-33). Frazier told pain specialist Dr. Lucia Lopez on April 6, 2016 that gabapentin "did nothing for the pain," and that physical therapy "did not help" her condition. (R. 648.) She also told Dr. Alex Behar on March 11, 2016 that therapy was not beneficial. (R. 645.) Nor did the epidural injections that Frazier received in 2016 provide any relief for her back pain. (R. 673.) Importantly, her doctors clearly believed Frazier and took measures to relieve the symptoms she alleged: Dr. Behar restarted Frazier on gabapentin in March 2016, beginning with 600 mg. a day and increasing to 1,200 mg., and Dr. Mikhail referred her in July 2016 for a second EMG study. (R. 646, 667.) Without discussing why Frazier continued to need such medical interventions, the ALJ did not adequately explain why Frazier's conservative treatment was sufficient to manage her pain. Remand is therefore required so that the ALJ can build a logical bridge between the record and her evaluation of the symptoms that Frazier described.

### D. Substantial Evidence Does not Support the RFC Finding.

Frazier also argues that substantial evidence does not support the ALJ's RFC finding that she can perform light work as long as various exertional and non-exertional restrictions are put in place to limit the exertional capacity that light work requires. The RFC measures what work-related activities a claimant can perform despite her limitations. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004); SSR 96-8p. An ALJ must consider all the evidence in the record including the medical source statements, the claimant's medical history, daily activities, and lay reports. SSR 96-8p. Both medical and non-medical evidence are important in determining the RFC because, although the RFC is a legal decision for an ALJ to make, she may not do so without an adequate evidentiary basis. *See Diaz*, 55 F.3d at 306 n.1. In addition, SSR 96-8p requires an ALJ to provide a narrative discussion on how the evidence supports each of the RFC conclusions and how the claimant is able to sustain "work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent schedule)." SSR 96-8p.

The ALJ did not comply with these requirements in determining Frazier's RFC. The ALJ assigned significant weight to the May 19, 2014 report of the state-agency expert Dr. Armand, who concluded that Frazier had the RFC to carry out light work but could only occasionally stoop, crawl, or climb ladders, ropes and scaffolds. Dr. Armand also stated that Frazier would need to avoid concentrated exposure to fumes, odors, dusts, and gases. (R. 59-61.) The ALJ then gave the same weight to the March 4, 2015 report of Dr. Nenaber, which agreed with most of Dr. Armand's conclusions. (R. 74-84.) The ALJ reasoned in broad terms that these opinions were consistent with the record and that, as state-agency experts, both doctors were expert in evaluating medical impairments. (R. 110-11.)

18

The ALJ reliance on the state-agency experts to formulate the RFC fails, once again, to account for the fact that both Dr. Armand and Dr. Nenaber issued their reports before Frazier's alleged onset date of October 10, 2015. As noted above, the ALJ reasoned in other parts of the decision that another set of exertional restrictions issued by one of Frazier's treating physician, Dr. Kesani, should be given little weight, in part, because it had been issued before the onset date. (R. 108.) The ALJ never explained why the state-agency doctors' opinions could be accepted, even though they were issued before October 2015, when Dr. Kesani's findings were rejected on that ground. A reviewing court cannot uphold an ALJ's finding that is based on illogical reasoning. *See Allord v. Barnhart*, 455 F.3d 818, 821 (7th Cir. 2006); *Ynocencio v. Barnhart*, 300 F. Supp.2d 646, 654 (N.D. Ill. 2004). Moreover, the ALJ had good reason for emphasizing the relevance of the post-onset medical evidence. Frazier testified that her condition worsened after that point, and the record clearly shows that she underwent tests and treatments whose nature and results were not available to the state-agency experts that the ALJ favored. That includes increased dosages of medication, abnormal EMG tests, and multiple complaints of severe pain. The ALJ's failure to address these issues leaves it unexplained how she went about assessing Frazier's RFC. She claimed that "the evidence as a whole" supported it but, as was the case with the ALJ's symptom analysis, such generalized references to the record are insufficient to establish a logical bridge between the medical evidence and the RFC assessment. *See Larson*, 26 F. Supp.3d at 811.

The ALJ also found that Frazier's daily activities justified the RFC, stating that Frazier's testimony was consistent with the RFC of light work "even if the claimant's daily activities are as limited as alleged." (R. 111.) Yet the activities that the ALJ cited strongly suggests that is not the case. An individual who must sit down to prepare a sandwich, cannot make her own bed, and needs to ride in a cart to shop – alleged restrictions that the ALJ never questioned – almost certainly

19

cannot carry out the exertional burdens of light work eight hours a day, five days a week. Nor did the ALJ explain how someone like Frazier, who testified that she could only stand for 10 minutes at a time, would be able to stand and/or walk for up to six hours a day, as light work requires. The ALJ was obligated either to adequately address why Frazier's alleged limitations were not as severe as she claimed, which the ALJ failed to do, or to explain how she could carry out light work despite those restrictions. Doing so would have required the ALJ to clarify "how the evidence supports each [RFC] conclusion, citing specific medical facts." SSR 96-8p. The ALJ's failure to do so requires remand. *Briscoe*, 425 F.3d at 352. *See also* SSR 96-8p (requiring an ALJ to "include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence").

## III. CONCLUSION

For the reasons set forth above, claimant's motion for summary judgment [12] is granted. The Commissioner's cross-motion for summary judgment [19] is denied. This case is remanded to the Social Security Administration for further proceedings consistent with this Opinion. It is so ordered.

**ENTERED: 01/10/19**

_____
**Michael T. Mason**
**United States Magistrate Judge**